# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>2005 Chrysler Town and Country Van<br>Bearing Colorado License Plate 324GLQ<br>VIN: 1C4GP45R95B175321, and any person therein | )<br>)<br>)<br>)<br>)<br>) | Case No.   19-sw-05852-GPG |

## APPLICATION FOR A SEARCH WARRANT

I am a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A attached hereto and hereby incorporated by reference.

located in the _____State and_____ District of _____Colorado_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B attached hereto and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Interstate Communication of Threats |

The application is based on these facts:

See Affidavit attached hereto and hereby incorporated by reference.

☑ Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____s/ John Busch_____
*Applicant's signature*

John Busch, Specal Agent, FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.

☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   8/29/2019

_____
*Judge's signature*
Gordon P. Gallagher - Magistrate Judge

City and state:   Grand Junction, Colorado

_____
*Printed name and title*

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

A silver 2005 Chrysler Town and Country van bearing Colorado license plate 324GLQ and/or VIN: 1C4GP45R95B175321 registered to Daniel Gallegos.

## ATTACHMENT B

## <u>DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED</u>

The following items that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Sections § 875(c):

1. Notebooks, notebook paper, white paper, envelopes, white out, or stamps;

2. Any objects meant to be used in a sexual manner to include sex toys, lubricants, condoms, sexual restraints, or other items;

3. Any cleaning or washing supplies;

4. Any flour or packaging for flour, or any other evidence indicating the presence of flour or its possession by GALLEGOS;

5. Pruners, clippers, wire cutters, saws, or any other item that could be used to amputate fingers or limbs;

6. Eyebolts or other hardware which could possibly be used to assist in restraining individuals;

7. Stretch wrap, plastic wrap, tarps, garbage bags, or any other item that could be used to cover an area to shield it from biological or trace evidence;

8. All items which could be used to restrain a person or used as a ligature, such as handcuffs, ropes, zip ties, or cords;

9. All items which could be used to conceal a person's identity, such as masks, makeup, or black or camouflage clothing;

10. Any marijuana or other product containing tetrahydrocannabinol (THC);

11. Any illegal drugs or prescription medications;

12. All records, information, documents, receipts, or other items related to the purchase of the items listed above, including the manner and means of such purchases;

13. All records, information, documents, or other items containing hand writing;

14. All records, information, documents, or other items containing threats to kidnap or injure the person of another;

15. Any weapons, including firearms; firearms components, parts, and accessories; ammunition; ammunition components parts and accessories; knives; tools; or other items

that could cause injury potentially consistent with descriptions in the letters obtained in this investigation;

16. All records, information, documents, or other items pertaining to mental health treatment or research related to mental health;

17. All records, information, documents, journals, photographs, videos, or other items indicating the surveillance of another, the selection of a victim, or otherwise evincing an intent to kidnap or injure the person of another;

18. All records, information, documents, journals, photographs, videos, or other items that include a potential motive or explanation for the criminal activity under investigation;

19. Maps, GPS devices, or other items that indicate the historical whereabouts of GALLEGOS and/or the vehicle to be searched;

20. Any items that are indicative of being from a person other than GALLEGOS;

21. All female clothing or personal items commonly owned by females;

22. Body parts;

23. Cigarette butts, samples of hair, hair brushes, or other items that may contain the DNA (Deoxyribonucleic acid) of another person;

24. All records, information, documents, or other items related to the Garden of the Gods in Colorado Springs, or otherwise indicating that GALLEGOS was at or researched this location;

25. All records, information, documents, or other items related to addresses associated with the letters obtained in this investigation, including the following addresses:
    a. Robert Rent, 967 Talia Way, Chino Valley, AZ 86323;
    b. 945 N. Temple Ave B, Starke, FL 32091;
    c. Tom Burford, 180 Spruce Ct., Annville, PA 17003;
    d. 610 5th Ave., Seattle, WA 98104;
    e. Bill Thomas Kidd, 19532 E. Sunset Circle, Aurora, CO 80015;
    f. 123 E. Speer Blvd., Denver, CO 80203;
    g. All records, information, documents, or other items indicating that GALLEGOS was at or researched the addresses or addressees listed above;

26. All records, information, documents, or other items indicating that GALLEGOS researched or had knowledge of serial killers, killing, hiding evidence, sexual assault, kidnapping, or restraining people.

27. All records, information, documents, or other items indicating proof of ownership and/or occupancy of the area to be searched;

28. Measurements, photos, and videos of the area searched to document the scene and

location and condition of any collected items;

29. Any hair and trace evidence, blood / DNA evidence, human tissue, and bodily fluid evidence. The process to collect and obtain such evidence may include the use of chemicals and alternate light sources;

30. Computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, digital storage media, any physical object upon which computer data can be recorded, cellular phones, smart phones, digital communications devices, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of violations of Title 18, United States Code, Sections § 875(c);

31. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

    b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f. evidence of the times the COMPUTER was used;

    g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    i. contextual information necessary to understand the evidence described in this attachment;

j.    volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

k.    any and all information, notes, software, documents, records, or correspondence, in any format and medium pertaining to violations of Title 18, United States Code, Sections § 1343 and Title 42, United States Code, Section § 408(a)(7)(B)

l.    items otherwise described in this attachment but contained on an electronic device of any sort.

32.  If evidence located during this search appears to relate to criminal acts other than violations of Title 18, United States Code, Sections § 875(c) and that are not listed in this Attachment, those items will not be further examined unless and until a search warrant is applied for and issued for evidence of any such separate criminal act.

<u>DEFINITIONS:</u>

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent John Busch, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge and belief:

## I. AGENT BACKGROUND

1.   I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since June 14, 2015.  Prior to my current position I was a sworn police officer for five and a half years in local law enforcement.  I am currently assigned to investigate a wide variety of federal criminal violations to include interstate threatening communications, domestic and international terrorism, violent crimes, public corruption, computer crimes, fraud against the government, drug crimes, and other violations. As part of my training and experience, I have participated in investigations involving cell phone tracking, United States Postal Service mailings, and threats of violence.

2.   As part of my duties, I investigate criminal violations occurring in the Western Slope of Colorado.  I am the case agent on this case.  As such, I am fully familiar with the facts of the case.

## II. PURPOSE OF AFFIDAVIT

3.   This Affidavit is made in support of an application for a warrant to search a motor vehicle of Daniel GALLEGOS, described as a Silver 2005 Chrysler Town and Country minivan bearing Colorado license plate 324GLQ and/or VIN 1C4GP45R95B175321 (Subject Vehicle).  I respectfully submit that there is probable cause to believe that evidence, and instrumentalities relating to violations of Title 18, United States Code, Section 875(c), interstate transmission of communications containing threats to kidnap or injure, will be found within the subject vehicle.

4.   The facts set forth in this affidavit are based on my personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and computer records related to this

investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. This affidavit is intended to show that there is sufficient probable cause to search the subject vehicle identified herein and described more fully in Attachment A, incorporated herein by reference, and seize the fruits, evidence, and instrumentalities described herein and described in Attachment B, incorporated herein by reference, and does not purport to set forth all of my knowledge of, or the investigation into, this matter.  I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary and applicable to establish the appropriate foundation of probable cause for the issuance of a search warrant.  I have not purposely omitted any fact(s) that undermine or are contrary to the opinions and conclusions set forth herein.

## **PROBABLE CAUSE**

5.   The United States, including the FBI, is conducting a criminal investigation of Daniel Albert GALLEGOS, regarding possible violations of 18 U.S.C. § 875(c).

6.   On August 23, 2019, I became aware of a letter received by the Bradford County Sheriff's Office; located in Starke, Florida.  The envelope that contained the letter had a return address for "Robert Rente" at "967 Talia Way, Chino Valley AZ 86323" and a mailing address of "945 N Temple Ave B, Starke, FL 32091."  The letter had a United States Postal Service sorting and processing stamp on it that indicated it was sent from Grand Junction, Colorado on August 17, 2019.  The postage stamp on the envelope was a forever stamp with a barcode and correlating numbered code.

7.   Within the envelope were three photo copied notebook pages with a hand written letter. According to Bradford County Sheriff's Office investigators, the letter that was sent to them had white out over sections where the author wrote about mental health diagnoses.  The letter also

had "Moab" "Grand County" and "Delta County" written in white out on the letter. A scan of the

letter is below:

I have the urge to write, I am currently having a lot of trouble with my homicidal ideation, I don't know why. I'm just obsessed with murder, Last Psychiatrist said it was intrusive thinking induced by _____. He also diagnosed me with _____.

One psychiatric nurse practitioner thought I had antisocial personality disorder. I know personally that I have that. Lately, my urges and compulsions have been incontrollably strong. Every time I see young beautiful females, ages 15-30, I so badly wish to lure them to my van, take them to a remote location, and pleasure them. I don't need them to physically please me. Touching them and giving them an orgasm will turn me on just fine. When they are thoroughly pleasured, I want to strangle them, either with my hands or a ligature. At that time I will undress their body, if I haven't already, to dispose of the evidence from being in my van. I will then wash them, their neck, breasts, and vagina, which I may likely deposit saliva while pleasuring them. I will than dust them with flour. I may then use pruners to

Fingerprint Free!  ☺

NO Empathy
NO Remorse
Detatched

evergreen state → gem state → beehive state →
The Centennial State

remove their fingers to throw in every direction, to increase the size of the crime scene and throw off law enforcement. I may or may not at that time decapitate the body, so that I can play with the head in a different location, if I have a secure location. I will not risk detection. I will retreat to a safe location to remember, fantasize, and masturbate until I am sexually satisfied. I have steps I need to complete before I can hunt and capture.

- install eyebolt on floor of van to which handcuffs may be attached.
- Disable passenger door handle
- Disable power window switch an passenger door
- Purchase handcuffs
- Purchase Flour
- Purchase meat hand saw and pruners
- purchase stretch wrap for passenger seat
- purchase latex gloves
- purchase cannabis product to relax the woman/girl.
- purchase bags for transport of head and fingers in case of struggle and scratching occurring.
- collect cigarette butts to distribute at crime scene, and hair from barber shop or hair brushes that I find.

Sexually deviant since childhood

Will need LOTS of Flour

I have been admitted to a
psychiatric hospital for homicidal
ideation. at which time I was
misdiagnosed with OCD and MD.
This will prove to be a grave mistake.
My urges are stronger than ever.
The only thing that will save me
and countless women is love.
I am trying to date a woman from
~~. Hope, and fate
hangs on by a thread. I may
anonymously contact a therapist
online to speak of my plans.
I await the response from this
woman I hope to date. God have
mercy on us all if I am rejected
by yet another woman

I'd sign but that would be too easy ☺

RMGREENIEGDLSRLFA

One of us is
DISTURBED

★ 38.8784 °N        ♡      May be 3 people
104.8698 °W                   in 1 body
                              You figure it out

P.S. I may also be bipolar, which means
I am prone to drastic actions during mania.
If you think this is a joke, think again.
Clock's ticking. My control wavers. ☺

Thought you deserved a head start,
Sort of...

8.   The letter contains details about the author's mental health, extensive homicidal plans, ways to conceal his identity and his crimes, and clues about his identity.  The letter ends with "If you think this is a joke, think again.  Clock's ticking.  My control wavers."  Accordingly, the letter clearly establishes a communication containing a threat from the writer to kidnap and injure the person of another.

9.   The locations referenced in this letter and Bradford County (the addressee) are all locations tied to serial killer Ted Bundy.  The states referenced in the letter are most of the states that Bundy killed in, and Bradford County is the county where Bundy was held until his execution.  The letter also included GPS coordinates for a location in Colorado Springs known as Garden of the Gods.  Finally, the letter was sent to Florida from Grand Junction, Colorado, and, therefore, was sent in interstate commerce.

10. The barcode and correlating numbered code on the postage stamp are used in part to track where the stamp was purchased.  The United States Postal Inspection Service searched their internal record keeping and found records indicating that the stamp, along with two others, was purchased on August 17, 2019 at 12:37 PM at a postage kiosk located at the United States Post Office located 241 North 4th Street., Grand Junction, CO 81501.  The kiosk also captured a surveillance photograph of the person purchasing the stamp.  The record system also recorded the full credit card number of the credit card used for payment.  The credit card ended in 5077.

11. I determined the credit card was a Net Spend Corporation credit card.  Through additional legal process, I obtained account information for the credit card ending in 5077 from the Net Spend Corporation.  This information included account owner details, transaction histories, and other information.  The owner details showed the owner as DANIEL A GALLEGOS, with an address of 1535 Poplar Dr, Apt 18, Grand Junction, CO, a phone number of 970-201-3790, an email of dag4170@gmail.com, and other identifying information.  I

searched law enforcement databases with the owner details and found a match for the Daniel Albert GALLEGOS, whom this affidavit is in reference to.

12. I received a photograph from GALLEGOS' driver's license and a photograph from a domestic violence arrest/booking by Mesa County Sheriff's Office in June 2019; these known photographs matched the individual who purchased the stamp in the postage kiosk surveillance photograph.

13. The transaction history of the credit card showed a transaction that occurred at the Grand Junction, CO Walmart Supercenter on August 15, 2019.  I went to the Walmart Supercenter located at 2545 Rimrock Ave, Grand Junction, CO and retrieved a receipt showing that the credit card ending in 5077 purchased white out, beef jerky, and envelopes on August 15, 2019 at 10:40 PM.  I reviewed the video surveillance footage of the transaction and confirmed that it was GALLEGOS making the purchase. Through the surveillance footage, I observed that GALLEGOS had driven a silver minivan to Walmart and after the purchase slept in the minivan in the Walmart lot until approximately 10 AM the following day.  Motor vehicle records show that a Silver, 2005, Chrysler Town and Country Minivan bearing license plate 324GLQ and VIN 1C4GP45R95B175321 is registered to GALLEGOS.  The incident of domestic violence from June, 2019 in which GALLEGOS was arrested also occurred in a minivan.  The size of the envelopes were the same size envelopes as the one received by Bradford County and the following described letters received by the Denver Police Department and Seattle Police Department.

14. On August 27, 2019, Detective Marshall of the Denver Police Department advised me that Denver 7, the ABC news channel, received a letter with a postage stamp that had at least 14 out of 15 characters identical to the Bradford County letter postage stamp.  The last character was not legible due to the USPS sorting and processing stamp over the postage stamp.  Having 14 out of 15 characters identical to the Bradford County letter postage stamp indicates that these

stamps were purchased in the same transaction.  The USPS sorting and processing stamp was the same as the Bradford County letter stamp: Grand Junction, CO on August 17, 2019.  A copy of the letter is below:

Denver 7,

Get ready to cover a fun
story. A game is commencing!
Police in Seattle PD and
the sheriff in Bradford County
Florida are going to be trying
to find a disturbed individual
with plans to murder countless
young women. You get to play
too! Hear this. Colorado is a
fun place to play! Can anyone
figure out the solution before its
too late?

FSM

Bill Thomas Kidd
19532 E Sunset Circle
Aurora CO 80015

GRAND JUNCTION CO 815
17 AUG 2019 PM 2 1



FOREVER USA

183 E. Speer Blvd
Denver CO 80203-341

8020383417

15. A third letter was received by the Seattle Police Department.  That letter was identical to the letter received by Bradford County.  The envelope of the Seattle letter had a postage stamp with the exact 15 digit numerical barcode number as the Bradford County postage stamp.  The USPS sorting and processing stamp also showed it was sorted through Grand Junction, CO on August 17, 2019.

16. Other information obtained through this investigation regarding GALLEGOS corroborates details in the letters, establishing that GALLEGOS is the author of the letters.

a.    On October 19, 2018 Grand Junction Police Department (GJPD) responded to GALLEGOS' home after his wife reported him to be threatening suicide.  GALLEGOS told the responding officer that the felt like killing anyone and that his medications were off. Gallegos was given a ride to Mind Springs, a mental health center.

b.    On November 14, 2018 GJPD again responded to GALLEGOS' home after his wife reported him to be armed with a knife and threatening suicide. GALLEGOS spoke about being cannibalistic and that he was going to eat people. GALLEGOS was given a ride to Mind Springs.

c.    On January 13, 2019 Law Enforcement again responded to a report that GALLEGOS wanted to kill himself.

d.    Through an open records search, the FBI found postings on a website, psychcentralforums.com, from user name Dag4170 from August 2019.  Dag4170 is the prefix for GALLEGOS' email: Dag4170@gmail.com, and DAG are his initials. Dag4170's postings include speaking about his diagnosis of Antisocial Personality Disorder among other disorders.  Dag4170 questions if he is a psychopath and mentions that he would manipulate his recent ex-wife.  GALLEGOS' wife has recently filed for divorce. In one post, Dag4170 wrote, "The twisted things I have compulsions are very unpleasant. Talking about it usually gets me in trouble. I won't even tell a therapist about

it after they went all Tarsoff [sic] on my \*\*\*. I lost my job because of the Tarasoff rule."

The Tarasoff rule is in reference to a case where it was decided that mental health

providers have a duty to warn. GALLEGOS lost his job in February of 2019 after his

work was notified of his homicidal ideations.

## A. SEIZURE AND SEARCH OF COMPUTERS

17. As described above and in Attachment B, I submit that if computers or storage media

are found in the Subject Vehicle, there is probable cause to search and seize those items for

the reasons stated below.  Some of these electronic records might take the form of files,

documents, and other data that is user-generated.  Some of these electronic records, as

explained below, might take a form that becomes meaningful only upon forensic analysis.

They may be seized and searched on-scene, and/or searched off-scene in a controlled

environment.

18. For example, based on my knowledge, training, and experience, I know that a

powered-on computer maintains volatile data.  Volatile data can be defined as active

information temporarily reflecting a computer's current state including registers, caches,

physical and virtual memory, network connections, network shares, running processes, disks

(floppy, tape and/or CD-ROM), and printing activity.  Collected volatile data may contain

such information as opened files, connections to other computers, passwords used for

encryption, the presence of anti-forensic tools, or the presence of programs loaded in

memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary

value is lost when a computer is powered-off and unplugged.

19. Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

downloaded to a storage medium can be stored for years at little or no cost.  Even when files

have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

20. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium, but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

21. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

22. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

23. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat,"  instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

24. I know from my training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple

persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the premises.

25. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

26. Based on my knowledge, training, and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data

recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

27. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    a.   On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    b.   On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

    c.   On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

28. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment.  This is true because of the following:

a.   The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how, when, and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, or (4) otherwise unlawfully possessed).

b.   The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e.   Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based on additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the

importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

29. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching or off-site

imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30. Because several people may share the Subject Vehicle, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

31. I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size.  Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs, and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

### III. CONCLUSION

32. Based on the investigation described above, probable cause exists to believe that at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 875(c).

33. I, therefore, respectfully request that the attached warrant be issued authorizing the

search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

_s/ John Busch_____
John Busch, Special Agent
Federal Bureau of Investigation

Subscribed, attested to, and acknowledged by reliable electronic means, on August __29__, 2019.

_____
GORDON P. GALLAGHER
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by AUSA Jeremy Chaffin.